**STRADLEY RONON STEVENS & YOUNG, LLP**
**By:    Michael J. Engle, Esquire**
      **Attorney ID: 85576**
**2005 Market Street**
**One Commerce Square, 26th Floor**
**Philadelphia, PA 19103**           **ATTORNEY FOR DEFENDANT**

---

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **vs.** | : | **CRIMINAL NO.: 2:24-cr-193** |
| | : | |
| | : | |
| **ASHOK PANIGRAHY** | : | *[FILED UNDER SEAL]* |

---

### SENTENCING MEMORANDUM

This memorandum is submitted on behalf of the Defendant, Dr. Ashok Panigrahy, to aid the Court's review of the Federal Rule of Criminal Procedure 11(c)(1)(C) Plea Agreement reached by the parties. Dr. Panigrahy has accepted responsibility by pleading guilty to Count 2 of the Indictment charging him with possession of material depicting the sexual exploitation of a minor, 18 U.S.C. §§ 2252(a)(4)(B) and 2252(b)(2). By accepting responsibility for his criminal acts, Dr. Panigrahy further recognizes that he has failed to live up to his reputation and his true character in this regard. He is a 53-year-old man whose character has been shaped by hard work and generosity, both to his colleagues and the medical community. The instant case is his first and only conviction. For the reasons set forth below, Dr. Panigrahy respectfully requests that the Court accept the negotiated plea and sentence him to a term of imprisonment of 48 months pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C), which is sufficient, but not greater than necessary, to achieve the purposes of sentencing.

# I.    DEFENDANT'S OBJECTIONS AND CALCULATIONS TO THE FINAL PRESENTENCE INTERVIEW REPORT.

### A.    Presentence Interview Report Revisions

The Defendant has no non-guideline corrections or additions to the Final Presentence Investigation Report ("PSI Report") dated June 9, 2025.

### B.    Guideline Objections and Calculations

The Defendant asserts no objections to the guideline calculations.

### C.    The Impact of the Negotiated "C" Plea

Given that the Guilty Plea Agreement in this case was entered into pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C), this Honorable Court must either accept the entire plea agreement and impose the specific sentence negotiated by and between the parties or if the Court rejects this negotiated plea agreement, consistent with Rule 11 (c)(5), the Defendant will have an opportunity to withdraw his plea. *See* PSI Report at ¶ 19.

Pursuant to U.S.S.G. § 6B1.2(c), Standards for Acceptance of Plea Agreements, "in the case of a plea agreement that includes a specific sentence (Rule 11(c)(1)(C)), the court may accept the agreement if the court is satisfied either that: (1) the agreed sentence is within the applicable guideline range; or (2) (A) the agreed sentence is outside the applicable guideline range for justifiable reasons; and (B) those reasons are set forth with specificity in the statement of reasons form."

The agreement to a sentence below the advisory guideline range represents a recognition by the prosecutor that there is an unusual or atypical circumstance in the case that warrants an imposed sentence below the guideline range. In *United States v. Coney*, the Court stated

> Prosecutors and defense lawyers sometimes enter into binding plea agreements that require a judge to impose a particular sentence or apply a particular sentencing range that is above or below that produced by proper application of the advisory Guidelines. When such a plea agreement smells

2

> too much like cow manure siphoned from a feedlot after a swampy, summer rain, judges should not pretend the odor is lilac. On the other hand, if the plea agreement stinks, but the stench is more like kitty litter than cow manure, a judge should hold his or her nose and move on. The trick is to discern the difference. 390 F.Supp.2d 844, 845 (D. Neb. 2005).[1]

The Court in *Coney* explained why it accepted a Rule 11(c)(1)(C) plea to a below Guideline range sentence based on a *Booker* variance. In that case, the Defendant entered into a Rule 11(c)(1)(C) plea agreement to a specific sentence of 57 months of imprisonment. *Id.* at 847. The parties' calculated a guideline range of 46 to 57 months of imprisonment and agreed that the Defendant should be sentenced at the top of that guideline range. *Id*. at 848. However, the probation officer in the presentence report calculated the Defendant's guideline range of 87 to 108 months of prison. *Id.* When determining the appropriate sentence, the Court stated that "'justifiable reasons' for accepting a stipulated sentence or range above or below the Guidelines can profitably be split into two categories. They are (1) reasons found within the Guidelines and thus consistent with them, and (2) reasons found outside the Guidelines that are consistent with the statutory goals of sentencing and do not undermine the Guidelines." *Id.* at 850. The Defendant was sentenced in accordance with the plea agreement to 57 months. *Id*. at 849. The Court concluded that "[w]hile the 'stink' of that agreement was strong enough to warrant investigation, it was not so strong as to require rejection." *Id*. at 854.

In the matter *sub judice*, both the government and the Defendant respectfully submit that the negotiated sentence remains the appropriate disposition of this case because justifiable reasons exist to grant a downward variance from 78 months to 48 months as set-forth herein below.

---

[1] *See also United States v. Rutherford*, 2022 WL 610945 (W.D. PA 2022)(despite a good-faith sentencing calculation error, the Court accepted the Rule 11(c)(1)(C) plea).

<u>"Justifiable Reasons" from Within the Guidelines</u>

"If a Rule 11(c)(1)(C) plea agreement requires a sentence or sentencing range outside the Guidelines, the plea agreement should be accepted *if* the plea agreement can honestly be justified by reference to a specific provision of the advisory Guidelines even though that sentence or sentencing range is otherwise outside the Guidelines." *Coney*, 390 F.Supp. 2d at 850. The parties' agree that a sentence of 48 months of imprisonment is appropriate despite the final PSI Report calculated guideline range of 78 to 97 months of imprisonment. The sentence of 48 months should be accepted by this Honorable Court for justifiable reasons. Sections II and III of this Sentencing Memorandum set-forth multiple variance arguments based on the Defendant's ███████████ his character, and commitment to the medical community. *See* 18 U.S.C. § 3553(a).

<u>"Justifiable Reason" from Outside the Guidelines</u>

"If a Rule 11(c)(1)(C) plea agreement requires a sentence or sentencing range outside the Guidelines, and the plea agreement cannot honestly be justified by reference to a specific provision of the Guidelines, a judge should presume that the plea agreement is improper and therefore the judge should reject it *unless* the parties can demonstrate that (1) use of the bargained-for sentence or range will not undermine the Guidelines and (2) there is a compelling reason for implementing the agreement." *Id.* at 851. Here, sentencing in accordance with a reasonable plea agreement allows the parties who are negotiating in good faith to enjoy the benefits of their bargain, encourages future plea negotiations, and promotes fairness. The negotiated sentence in the instant case will not undermine the Guidelines, as it is neither offensive nor inappropriate, and the reasons for the negotiated plea are justified by the specific facts of this case and the history and characteristics of this unique Defendant.

First, the parties negotiated the sentence in this case in good faith. The insight of the parties

and their knowledge of the facts and circumstances surrounding this case should be given great weight and deference. The integrity of guilty plea negotiations is at the core of our federal criminal justice process and to reject a fairly negotiated sentencing disposition via a guilty plea agreement would undermine the integrity of this important process.

Second, there are numerous bases for the Court to find that a variance from the guidelines is warranted in this specific case. This Defendant's unique history and characteristics, as detailed herein below, establish several rationales in support of a mitigated sentence. Therefore, Dr. Panigrahy respectfully submits that this plea agreement for 48 months of imprisonment satisfies the statutory purposes of sentencing and should be accepted by this Honorable Court as a fair and just disposition of this matter.

## II.    LEGAL ANALYSIS RELATED TO SENTENCING GUIDELINES OF CHILD PORNOGRAPHY OFFENSES.

### A.    *The Sentencing Commission's Report to Congress.*

Dr. Panigrahy urges this Court to sentence him to a term of 48 months of imprisonment agreed to by the parties, which is below the advisory sentencing guideline range. He contends that an examination of the history of sentencing for child pornography justifies the requested sentence in this case.

Much has been written about the sentencing guidelines and enhancements applied to cases involving child sexual exploitation materials. "There is widespread agreement among judges, lawyers and legal scholars that the guidelines for child pornography offenses are seriously flawed." *United States v. Childs*, 976 F.Supp.2d 981, 982 (S.D. Ohio 2013). In fact, in February 2013, the Sentencing Commission released a report to Congress on the child pornography guidelines for non-production offenders. *See* United States Sentencing Commission, Report to the Congress: Federal

Child Pornography Offenses (2012) (hereinafter "Child Pornography Report")[2]. The Commission explained that it compiled the report in large part due to the increasing rate of below-guideline sentences for offenders sentenced under U.S.S.G. § 2G2.2, pursuant to its statutory duty to "consider whether the guidelines are in need of revision in light of feedback from judges as reflected in their sentencing decisions," and because "as a result of recent changes in the computer and Internet technologies that typical non-production offenders use, the existing sentencing scheme in non-production cases no longer adequately distinguishes among offenders based on their degrees of culpability." *Id*. at ii. The Commission explained that because the enhancements for computer use and type and volume of images "now apply to most offenders," the guideline "fail[s] to differentiate among offenders in terms of their culpability." *Id*. at iii. It explained that "technological changes have resulted in exponential increases in the volume and ready accessibility of child pornography, including many graphic sexual images involving very young victims, a genre of child pornography that previously was not widely circulated." *Id*. at 6. Because "sentencing enhancements that originally were intended to provide additional proportional punishment for aggravating conduct now routinely apply to the vast majority of offenders," *Id*. at xi, the "current guideline does not adequately distinguish among offenders regarding their culpability for their collecting behaviors," *Id*. at 323.

Congress's actions with respect to the child pornography guideline have stemmed in large part from the belief that those who view child pornography are actually child molesters. Under this view, punishing child pornography possessors serves as a proxy for punishing child sexual abusers, aside from the lack of evidence to support this belief in general, *see* Child Pornography Report at

---

[2]    https://www.ussc.gov/sites/default/files/pdf/news/congressional-testimony-and-reports/sex-offense-topics/201212-federal-child-pornography-offenses/Full_Report_to_Congress.pdf
(last accessed August 29, 2025).

104 (confirming that "not all child pornography offenders are pedophiles or engage in other sex offending"). Dr. Panigrahy has not been convicted of sexually abusing a child, has not in fact sexually abused a child, and is at no risk of physically harming a child. This distinguishes Dr. Panigrahy from the offenders Congress had in mind and is therefore highly relevant to this Court's determination of the appropriate sentence in this particular case.

In addition, technology has changed the nature of this offense. In the past, child pornography had to be obtained in a risky and secretive manner for substantial sums of money, whereas today, images of child pornography are available for free in the privacy of one's home, with no planning and minimal effort, all on the internet. As a result, less dangerous people commit this offense than was previously the case, even though the guideline range is much higher now.

As many courts have observed, the child pornography guideline, by enhancing sentences based upon factors that are inherent in the crime and thus appear in nearly every case, concentrates offenders at or near the statutory maximum and thus fails to meaningfully distinguish more serious offenders from less serious offenders. As one court observed, sentences at or near the statutory maximum should be reserved for the "worst possible variation of the crime" committed by the most dangerous offender. *See United States v. Aleo*, 681 F.3d 290, 302 (6th Cir. 2012).

Dr. Panigrahy's conduct and characteristics could not be farther from these. He has never improperly touched a child, he has admitted his crimes, and he has fully accepted responsibility for his offense. No evidence indicates he presents a risk of ever physically harming a child and this Defendant has taken steps to obtain therapy and treatment in an effort to make sure that he never engages in this conduct in the future. Therefore, Dr. Panigrahy is the offender for whom the negotiated plea agreement is reserved.

### B. *Enhancements That Apply In Nearly Every Case Do Not Serve Their Purpose.*

Dr. Panigrahy contends that the negotiated 48-month sentence is appropriate, even given the fact that the Guidelines suggest a higher sentence, particularly since the fact that the inclusion of a two-level increase, per U.S.S.G. § 2G2.2(b)(6), is unreasonable, given the presence of the internet in the dissemination of pornography. Specifically, his base offense level has been increased by two levels per U.S.S.G. § 2G2.2(b)(6), which provides:

> If the offense involved the use of a computer or an interactive computer service for the possession, transmission, receipt, or distribution of the material, or for accessing with intent to view the material, increase by **2** levels.

Certainly, at one time, the pornography trade was conducted through seedy store fronts or via mail, as images were reproduced on paper. But now, the primary means of distribution is through the internet. Hence, a two-level increase for computer/phone accessing of child pornography is likely given to almost <u>all</u> of those who are found to be in illegal possession of this type of contraband.

In 2023, 97.1% of the 1,448 offenders sentenced under § 2G2.2(b)(6) received this enhancement.[3] This percentage shows that this crime is so associated with the use of a computer or computer like device, that this factor is essentially part of the crime itself. In other words, this characteristic describes conduct that is "essentially inherent to the crime itself," not an aggravating factor describing a more serious offense or higher risk of harm. *United States v. Kelly*, 868 F. Supp. 2d 1202, 1208-09 (D. New Mexico 2012) .

---

[3] *See* Unite States Sentencing Commission, Use of Guidelines and Specific Offense Characteristics Guideline Calculation Based, Fiscal Year 2023. https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/guideline-application-frequencies/2023/Ch2_Guideline_FY23.pdf  (last accessed August 27, 2025).

As one court has recognized, enhancements that apply in "almost every case" are contrary to the purpose of enhancements, which "are meant to increase a sentence for conduct more aggravated than the typical type of offense." *United States v. Robinson*, 669 F.3d 767, 778 (6th Cir. 2012). (discussing the enhancement for "use of a computer"). Such enhancements render § 2G2.2 an "anomaly." *Id*. The Sentencing Commission confirms that "sentencing enhancements that originally were intended to provide additional proportional punishment for aggravating conduct now routinely apply to the vast majority of offenders," so that the "current guideline does not adequately distinguish among offenders regarding their culpability for their collecting behaviors," Child Pornography Report at 323.

In child pornography cases, increases in offense levels are relevant and proper when the crime is furthered, increased, or truly enhanced by that specific conduct. But if almost all child pornography cases involve the use of a computer or smart phone, then this conduct is not supportive of an enhancement, but is, in most cases, intertwined with the crime itself. The simple use of a computer in these circumstances would not be worthy of the computer enhancement. This two-level increase takes the advisory range from 63-78 months to the 78-97 months in this case.

### III.   THE 18 U.S.C. § 3553(A) SENTENCING FACTORS SUPPORT A VARIANCE FROM THE ADVISORY GUIDELINE RANGE.

The advisory Sentencing Guidelines range is only one of several relevant factors in the Court's determination of a reasonable sentence. Sentencing courts must consider each of the factors enumerated in 18 U.S.C. § 3553(a) in fashioning an appropriate sentence. *See, e.g. United States v. Booker*, 543 U.S. 220, 259-60 (2005):

> (1)  the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2)  the need for the sentence imposed…;
>
> (3)  the kinds of sentences available;

(4)  [the applicable Sentencing Guidelines]…;

(5)  any pertinent [Sentencing Guidelines] policy statement…;

(6)  the need to avoid unwarranted sentencing disparities among defendants with similar records that have been found guilty of similar conduct; and

(7)  the need to provide restitution to any victims of the offense.

The sentence to be imposed must be "sufficient, but not greater than necessary" to comply with purposes of sentencing outlined in 18 U.S.C. § 3553(a)(2), taking into consideration the factors outlined above. *See also United States v. Ausburn*, 502 F.3d 313, 327 (3d Cir. 2007) (noting that the sentencing court, in the post-Booker era, has the "discretion to craft an appropriate sentence falling anywhere within the range of punishments authorized by Congress.").

Therefore, sentencing under Section 3553(a) requires the Court to start with the *minimum* sentence permissible and add only so much additional punishment, if any, as is necessary to vindicate Section 3553(a)'s purposes. As discussed below, an analysis of the Section 3553(a) factors reveals that a term of 48 months imprisonment would be sufficient, but not greater than necessary, to fulfill the aims of sentencing.

### A.  *Dr. Panigrahy's Personal History and Characteristics Support the Agreed-Upon Sentence.*

#### 1.  Background.

Dr. Panigrahy was born on September 24, 1971 in Franklin, Pennsylvania, and while he was born a citizen, his parents were immigrants from India. His father worked for Alleghany Ludlum Steel in Pittsburgh and his mother gave up her engineering career to care for him and his older brother. As an infant and child, he had a lot of allergies and viral illnesses resulting in several doctor visits and a few hospitalizations. Dr. Panigrahy's doctors had suggested to his mother to enroll him in competitive sports when he was school age, and he then started to outgrow his allergies. He became a competitive swimmer at age six (6). █████████████





Dr. Panigrahy achieved great success in his education and then the medical field. He was an excellent student: he graduated from Boston University with a B.A. and then graduated with a M.D. from the School of Medicine.[6] He participated in the Howard Hughes Medical Institute Fellowship at Boston University Medical Campus. He completed a medical internship at the Lemuel Shattuck Hospital in Jamaica Plain, Massachusetts. Dr. Panigrahy participated in his medical residency in the radiology department at UCLA from 2000 to 2004, then a fellowship in the neurology department from

---

[6] Exhibit **B** – Curriculum Vitae.

2004 to 2005, and a fellowship with pediatric radiology and pediatric neuroradiology from 2005 to 2006. Dr. Panigrahy continued his career at the University of Pittsburgh Medical Hospital, where he was Division Chief of Pediatric Radiology in his thirties. In addition to his full-time employment, he worked on research grants and publications; he has authored and co-authored over 200 publications. He excelled in mentoring researchers, residents and fellows. Dr. Panigrahy was the Gold Medal Award Honoree for his contributions to Pediatric Radiology by the American Society of Pediatric Neuroradiology in 2023-2024.



### 2.    Dr. Panigrahy' Extraordinary Personal Character.

Ashok Panigrahy is, at his core, a man of good character who has never been involved in any aspect of the criminal justice system. On the contrary, he has lived his entire life working to be a law-abiding and productive member of society. Dr. Panigrahy is a well-respected and highly regarded individual with an excellent reputation—a fact clearly demonstrated through the words and sentiments expressed in the character letters that have been submitted to this Court in support

of him.[7] *See also United States v. Wachowiak*, 412 F.Supp.2d 958 (E.D.Wis.2006) ("[T]he guidelines failed to consider defendant's otherwise outstanding character, as depicted in the many supportive letters, ... while § 3553(a)(1) requires the court to consider the character of the defendant, the guidelines account only for criminal history. *In cases where the defendant led an otherwise praiseworthy life, the court should consider a sentence below the advisory range.*") (emphasis added).

The character letters included herein are from a cross section of Dr. Panigrahy's medical colleague, friends, and family. Together the letters paint a rich and compelling portrait of Dr. Panigrahy, detailing the type of person the writers have known throughout their lives and who, despite his offenses here, they deem him to be today. This extraordinary community forms the pillars upon which he will maintain and in certain ways rebuild the foundations of his life.

Each letter details the writer's professional and personal experiences with Dr. Panigraphy over many years and sheds great insight into his character. The letters are from the following individuals:



---

[7] Exhibit **C** – Character Reference Letters.



A recurring theme within the character letters is best summarized by ▮▮▮▮ "Dr. Ashok Panigrahy is a hardworking, talented researcher, clinician, and leader as well as a kind, generous and thoughtful person." ▮▮▮▮ also states that

> Dr. Panigrahy's life's work is an important cornerstone that lays the template for future studies investigating the causes of adverse neurodevelopment in congenital heart disease.  I reiterate my highest regards for Dr. Panigrahy, both on a professional and personal level. He is not only brilliant as a clinician/clinician scientist, he is  also a honest and upright human being with a golden heart.  He has been a most caring physician who always wants to do the best for his tiny patients.   My interactions with Dr. Panigrahy over the years as a collaborator and colleague has  shown  beyond  any  doubt  of  his  integrity,  strong  moral character, and  an individual with a generous and kind heart.

The letters written on behalf of Dr. Panigrahy are of such great quality, it is difficult to choose certain portions to highlight. It is respectfully requested that this Honorable Court review in detail all the letters attached to provide an additional level of insight into the history and characteristics of Dr. Panigrahy that are critically important when fashioning a sentence.

3.    Dr. Panigrahy's Remorse and Acceptance of Responsibility.

Dr. Panigrahy is sincerely remorseful for his criminal conduct and has sought the forgiveness of his family, friends and colleagues. It is also counsel's belief that his remorse will be demonstrated to this Court at the time of allocution. Dr. Panigrahy has spent a significant amount of time discussing his criminal conduct with counsel and others in an effort to fully understand and appreciate the depth of his misconduct. Even the best and brightest in our society can become temporarily distracted from their duty and their responsibility. In this case, Dr. Panigrahy unfortunately lost sight of his duty and responsibility to those around him. He lost himself, his moral compass, and his true character during the time of the conduct. Fortunately, Dr. Panigrahy has recognized this fact and has taken it upon himself to accept responsibility for this conduct and to seek treatment. His behavior during the period from the time of his criminal conduct until now demonstrates that he is not at high risk to recidivate and that he is an otherwise law-abiding and productive member of society. Dr. Panigrahy wakes up every morning with the determination to continue moving forward in a positive direction.

4.    Release and Reentry Plan

a.    ███████████████

████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████





**IV.    COLLATERAL CONSEQUENCES OF CONVICTION.**

Dr. Panigrahy will endure significant collateral consequences as a result of the criminal conviction. "The United States has a uniquely extensive and debilitating web of collateral consequences that continue to punish and stigmatize individuals with criminal records long after the completion of their sentences." United States Commission on Civil Rights, *Collateral*

*Consequences, The Crossroads of Punishment, Redemption, and the Effects on Communities* (June 2019), Executive Summary, found at https://www.usccr.gov/pubs/recentbriefingreports.php.

The stigma of a felony conviction is an unfortunate badge that Dr. Panigrahy will wear for the rest of his life, and he will not be able to vote, participate in jury service, or receive a range of forms of public assistance. *See United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009) ("[T]he need for further deterrence and protection of the public is lessened because the conviction itself already [represents] substantial punishment of the defendant."); *United States v. Smith*, 683 F.2d 1236, 1240 (9th Cir. 1982) ("The stigma of a felony conviction is permanent and pervasive."); *United States. v. Wulff,* 758 F.2d 1121, 1125 (6th Cir. 1985) ("[A] felony conviction irreparably damages one's reputation.")

Most importantly, he will lose his medical professional license, including his ability to be a part of the medical profession. He will also have to comply with Sex Offender Registration and Notification Act (SORNA) as a convicted sex offender under the law of any state in which he resides, is employed, carries on a vocation, or is student. *See United States. v. Garate,* 543 F.3d 1026, 1028 (8th Cir. 2008) (noting it was appropriate for the district court to consider, under § 3553(a), the "lasting effects of being required to register as a sex offender"); *United States v. Pauley*, 511 F.3d 468 (4th Cir.  2007) (where client pled to possession of child pornography. and guidelines 78-97 months, court's downward variance to 42 months affirmed in part because "The district court also found that Pauley warranted a lower sentence because he lost his teaching certificate and his state pension as a result of his conduct. Consideration of these facts is consistent with § 3553(a)'s directive that the sentence reflect the need for "just punishment," *id.* § 3553(a)(2)(A), and "adequate deterrence," *id.* § 3553(a)(2)(B)").

As a man who has worked his whole life to build and maintain a positive reputation in the medical community, Dr. Panigrahy's conviction and the corresponding stigma will cause irreparable damage to his self-image. Additionally,  Dr. Panigrahy held a license to practice as a Medical Physician and Surgeon under the authority of the Board in the Commonwealth of Pennsylvania. As a result of the within conduct, Dr. Panigraphy entered into a Consent Agreement and Order with the Commonwealth of Pennsylvania, Department of State, Bureau of Professional and Occupational Affairs to voluntarily surrender his license to practice as a physician and a surgeon.[10] He also voluntarily surrendered his DEA Certificate of Registration and he is in the process of voluntarily surrendering his medical license in California.

**V.**



---

[10] Exhibit **F** – Consent Agreement and Order and Surrender for Cause of DEA Certificate of Registration.

[11]



## VI.     48 MONTHS OF IMPRISONMENT IS AN APPROPRIATE SENTENCE IN THIS CASE:

Dr. Panigrahy's agreed-upon sentence is an appropriate disposition in this matter. The guidelines should be given less weight as the Sentencing Commission and many courts have expressed serious reservations about them. While the guidelines are a starting point for a sentencing's court calculus, they are not the full measure of a person's culpability and do not always provide a sentencing range that achieves the purpose of sentencing.

Because the Defendant's case involves criminal conduct that is serious in nature, the parties recognized that incarceration is a necessary component of any sentence to be imposed. As part of the analysis, the *Howe* factors should be considered. By way of background, the Sentencing Reform Act ordered the Sentencing Commission to "insure that the guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense..." *Id.*  This directive was applied in the case of *United States v. Howe* where the Third Circuit upheld the district court's downward variance from a guideline range of 18 to 24 months of incarceration to a sentence of probation with 3 months of home confinement.  *Howe*, 543 F.3d at 141.  There, the defendant had been convicted after a jury trial of engaging in a wire fraud scheme and alleged two-year effort to cover up his criminal activity.  *Id.* at 131.  While the Government recommended an 18 month guideline sentence, the district court found, and the Third Circuit affirmed, that a downward variance was appropriate based on recognition of the following factors: (1) the criminal activity of the defendant was "an isolated mistake albeit an extraordinarily serious one"; (2) the defendant had "led an honorable and lawful life" until the time of his crime as attested to in over 40 character letters; (3) the defendant had no prior criminal history nor any history of any substance abuse; (4) the defendant was a well-regarded member of his community;

(5) the defendant regularly attended church and participated in church activities; (6) the defendant recognized the serious nature of his offense and was truly remorseful; and (7) the defendant was "a devoted husband, father, and son". Id. at 131-132.

In the instant matter, the Government has agreed to recommend a sentence of 48 months of imprisonment followed by a period of supervised release, a special assessment, fines and restitution. The following "*Howe*" factors support the recommended sentence in this case: (1) Dr. Panigrahy's offense was a more isolated "mistake" within the context of his entire life, albeit an extraordinarily serious one; (2) by all accounts he has led an honorable and lawful life up, as attested to character letters submitted to this Honorable Court; (3) Dr. Panigrahy has no prior criminal history; (4) he is a well-regarded member of his community; (5) Dr. Panigrahy recognizes and appreciates the serious nature of his offenses and he is truly remorseful; (6) he is committed to various treatment programs; (7) he is a devoted brother and friend and member of the medical community; and (8) he has a well-developed plan for his time in custody and upon his release.

Under the facts and circumstances of this particular case, including Dr. Panigrahy's history, characteristics, remorse, and post-offense treatment, a sentence substantially below the advisory guideline range of 48 months is sufficient, but not greater than necessary, to achieve the purposes of sentencing punishment. Dr. Panigrahy fully acknowledges the obligations of supervised release and is prepared to comply with all conditions imposed by the Court, including treatment requirements and restrictions as directed. He plans to live a law-abiding life devoted to rehabilitation, wellness coaching, spiritual development, and service to others, while maintaining stability at his residence ████████████████████ Dr. Panigrahy respectfully requests pursuant to 18 U.S.C. §3553(a) that this Court impose the negotiated sentence of 48 months of imprisonment.

## **CONCLUSION**

Based on the foregoing reasons, Dr. Panigrahy respectfully requests that this Honorable Court sentence him in accordance with the plea agreement to a term of imprisonment of 48 months pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C), which is sufficient, but not greater than necessary, to achieve the purposes of sentencing. Dr. Panigrahy also respectfully requests that this Honorable Court recommend that he be permitted to participate in the ███████████████ ███████████████ while in the custody of the Bureau of Prisons.

Respectfully submitted:

Michael J. Engle, Esquire

## **CERTIFICATE OF SERVICE**

I, Michael J. Engle, Esquire, hereby certify that I have forwarded a true and correct copy

of the foregoing *Sentencing Memorandum* to the following persons:

**Via Email and UPS**
The Honorable Judge Christy Criswell Wiegand
Joseph F. Weis, Jr.
U.S. Courthouse
700 Grant Street
Pittsburgh, PA 15219

**Via Email**
Heidi M. Grogan, AUSA
700 Grant Street
Suite 4000
Pittsburgh, PA 15219

**Via Email**
John I. Sims
U.S. Probation Officer
700 Grant Street
Suite 3330
Pittsburgh, PA 15219

/s/ Michael J. Engle, Esquire
MICHAEL J. ENGLE, ESQUIRE
ATTORNEY FOR DEFENDANT

DATED:   September 9, 2025